# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TERRI PARRISH, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:17-cv-00411 |
| vs. | : | |
| | : | District Judge Walter H. Rice |
| COMMISSIONER OF THE SOCIAL | : | Magistrate Judge Sharon L. Ovington |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

After concluding that she could no longer work as of January 23, 2013, Plaintiff Terri Parrish turned to the Social Security Administration for assistance by applying for Disability Insurance Benefits and Supplemental Security Income. The Social Security Administration denied her applications based on Administrative Law Judge Elizabeth A. Motta's conclusion that her health impairments did not constitute a "disability" under the Social Security Act. (Doc. #6, *PageID* #s 68-85).

Plaintiff mainly argues in this Court that ALJ Motta failed to properly evaluate the opinions provided by her treating physician Kwasi A. Nenonene, M.D., and by crediting the opinions of the record-reviewing physicians. She seeks an Order reversing the ALJ's decision and remanding this matter for payment of benefits or, at a minimum, for further

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

administrative proceedings.

The Commissioner maintains that substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity and disagrees, for various reasons, with Plaintiff's contentions. The Commissioner therefore asks the Court to affirm ALJ Motta's decision.

## II.    "Disability" Defined and Standards of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—*i.e.*, "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Present judicial review of ALJ Motta's decision proceeds along two lines: whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the

substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

If the ALJ applied incorrect legal criteria, reversal may be warranted even though the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.

## III.    Plaintiff and Her Testimony

Plaintiff was 49 years old on the date her asserted disability began (January 23, 2013). This placed her in the category of a younger person under social security regulations. 20 C.F.R. § 404.1563(c).[2] When she turned age 50, she moved into the category of a person closely approaching advanced age. *Id*. at § 404.1563(d).

Plaintiff graduated from high school and worked various jobs over the years, including the job of motor vehicle sub-assembler. (Doc. #6, *PageID* #s 171, 290-301).

Plaintiff's health problems include high blood pressure, Type II diabetes, sleep apnea, cervical degenerative-disc-ventral-cord abutment with broad protrusion, asthma, anxiety, dysthymia, and "explosive disorder." *Id*. at 325.

Plaintiff testified during a hearing held by ALJ Motta that she began having mental-health problems in 2005. She has diabetes "and it's getting worse…," she has high blood

---

[2] Citations to social security regulations will identify the pertinent Disability Insurance Benefits regulation with full knowledge of the corresponding Supplemental Security Income regulation.

pressure, and "just all kinds of things." *Id*. at 100. When she was employed, she was always out sick or she spent the majority of her shift in the medical area. Following her job at Delphi, she attempted to work but wasn't able to hold a job—she "didn't work for more than two weeks." *Id*.

Plaintiff's long-time physician, Dr. Nenonene, treats her for depression, diabetes, carpal tunnel syndrome, and all her health problems. At the time of the ALJ's hearing, Dr. Nenonene had treated Plaintiff for about 10 years.

Plaintiff testified that she takes insulin and Metformin to treat diabetes. Her blood glucose ranges from 300 to 400, even with insulin and Metformin. Her symptoms include weakness and frequent nausea. She has neuropathy in her hands and feet—it feels like someone is sticking needles into her feet. *Id*. at 102-03. Neuropathy makes her feet "real sore," and sometimes she can barely walk. *Id*. at 103. Plaintiff plays the piano or organ, but it increases the pins-and-needles feeling in her hands and causes her so much pain she starts crying. *Id*. The pain in her right hand is also caused by carpal tunnel syndrome. *Id*. at 104. Her index finger on her right hand gets numb. One physician instructed her to use braces for her carpal tunnel, but she cannot afford them.

Plaintiff testified that she can't control her anger. *Id*. at 107. Her father passed away about five months before the ALJ's hearing, and she "[could] not deal with it." *Id*. at 108. She loved her father and "didn't like that he suffered a lot." *Id*. She also suffers from the same health problems as her father. She noted, "it's kind of scary." *Id*.

Plaintiff sometimes forgets things she should remember. People complain to her about her memory ("why can't you … remember that"; "why can't you be more

organized"). *Id.* She forgets where she puts things. She forgets important things she has to do. She procrastinates. *Id*. at 109.

Plaintiff has explosive outbursts of anger. She tries not to get upset because she can't function when she is upset. She tries to keep calm and not let anything upset her. She can't function when she is upset. *Id*. at 109-10.

At the time of the ALJ's hearing, Plaintiff had been experiencing pain in her right index finger for three weeks without interruption. She explained that sometimes she has pain in her whole hand and arm. She also has almost daily chest pains, like she is having a heart attack. She testified, "It's really scary…, I go through life in fear, and I shouldn't have to live like that." *Id*. at 110. She has difficulty opening jars that have not been opened before. *Id*. at 110-11.

Plaintiff's children grocery shop for her. She does not like to be around other people; she hates crowds. She likes to be by herself most of the time. She sometimes attends church because there are not many people there.

During a typical day, Plaintiff lies around unless she has an appointment or something to do. She's not motivated to get up and do things. Instead, she always naps. *Id*. at 112. And, she hates the way she feels. She told the ALJ, "I just feel that—like I say, I've always worked since I was 15. I did not stop working till I got sick, and I was always going through depression and stuff…." *Id*. at 113. During her employment with Delphi, they let her go twice but hired her back. They then offered her, and other employees, a buyout because it appeared as though the plant was closing. She was one of the employees who left. She explained, "I said I wasn't working half of the time anyway. And I went and tried

5

two more jobs after that. And I just couldn't do it." *Id.* at 114.

Plaintiff acknowledged that she can cook sometimes, but she had not cooked during the three months before the ALJ's hearing. When she is feeling good, she can get up and cook a meal. If she is not feeling good, she does not worry about cooking. *Id.* She does her laundry once or twice a month. She does not mow grass or work in the garden. She visits her grandchildren but does not watch them for long because she doesn't feel like doing anything. Every now and then, she practices playing a new piece of music on the piano. *Id.* at 116-17.

**IV.    ALJs' Decisions And Most Recent Medical Opinions**

The administrative record establishes that Plaintiff has unsuccessfully applied for Disability Insurance Benefits and Supplemental Security Income on three separate occasions. On each occasion, Plaintiff's applications sought benefits during a new time frame. And, in connection with each time frame, a different ALJ found that Plaintiff was not under a disability.

- ALJ Redmond found Plaintiff not disabled from January 2003 to July 2009.

- ALJ Lombardo found Plaintiff not disabled from July 2009 to January 23, 2013.

- ALJ Motto found Plaintiff not disabled from January 23, 2013 to February 1, 2017.

The timing of these decisions is significant in part because ALJ Motto—like ALJ Lombardo before her—concluded that Plaintiff could perform a limited range of light work. Doing so, ALJ Motto credited the opinions provided by state-agency record-reviewing physicians Gary Hinzman, M.D. and Abraham Mikalov, M.D. (Doc. #6, *PageID* #s 215, 226-27). Dr. Hinzman reviewed the record in November 2014 and concluded that Plaintiff

6

could perform the same range of light work described by ALJ Lombardo in her previous decision. Dr. Hinzman reported that he adopted ALJ's Lombardo's assessment of Plaintiff's work abilities and limitations under Security Administration's Acquiescence Ruling (AR) 98-4(6) and *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 187 (6th Cir. 1997). (Doc. #6, *PageID* #215).

Dr. Hinzman also explained that his assessment of Plaintiff's residual functional capacity applied to the two-month period "from 1/24/13" (the day after ALJ Lombardo's decision) "to DLI 3/31/13" (the date Plaintiff was last insured for Disability Insurance Benefits). (Doc. #6, *PageID* #215). The upshot of this is that Dr. Hinzman did not assess, or offer an opinion on, Plaintiff's residual functional capacity after March 31, 2013. *See id*.

Dr. Mikalov reviewed the record in May 2015. He, like Dr. Hinzman, believed that Plaintiff could perform a limited range of light work. *Id*. at 226-27. Dr. Mikalov explained that he adopted ALJ Lombardo's previous assessment based on AR 98-4(6) and *Drummond*. *Id*. at 227. Dr. Mikalov noted that all the new evidence he reviewed "is after the DLI [date last insured]." *Id*. Consequently, Dr. Mikalov's review—unlike Dr. Hinzman's review— considered the evidence after 3/31/13 and until 5/12/2015, the date of Dr. Mikalov's decision.

ALJ Motta also reviewed the information and opinions Plaintiff's treating physician Dr. Nenonene provided in June 2016. Dr. Nenonene listed Plaintiff's medical conditions as diabetes mellitus, hypertension, anxiety, diabetic neuropathy, and urinary incontinence. He reported that Plaintiff's health problems had been ongoing for years and that she was "currently on chronic meds." (Doc. #6, *PageID* at 984). Dr. Nenonene opined that during

an 8-hour workday, Plaintiff could stand/walk for 2 hours (1 hour without interruption); sit for 2 hours (1 hour without interruption); and frequently or occasionally lift/carry 5-10 pounds.  Dr. Nenonene believed that Plaintiff was markedly limited in pushing/pulling, and moderately limited in bending, reaching, handling, and repetitive foot movements.  He based his opinions about Plaintiff's work limitations on the results of the physical exams he conducted during her office visits and on consultation reports.  Dr. Nenonene also indicated that Plaintiff was "unemployable" and would remain so for 12 or more months.  *Id*. at 995.

## V.    ALJ Motta's Decision

In reviewing the evidence connected to Plaintiff's application for benefits, ALJ Motta utilized the 5-step analysis enumerated in social security regulations.  *See* 20 C.F.R. § 404.1520(a)(4); *see e.g., Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir.  2018). Some of her more significant findings occurred at Steps 2 and 3 where she found that Plaintiff's severe impairments—"degenerative disc disease of the cervical spine, left carpal tunnel syndrome in the non-dominant hand, diabetes mellitus, obesity, hypertension, and an affective disorder with features of depression and anxiety"—plus her non-severe impairments did not automatically qualify her for benefits under the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. #6, *PageID* #s 71-76).

At Step 4, ALJ Motta concluded that Plaintiff could perform light work subject to many limitations:

> (1) lifting and carrying up to 20 pounds occasionally and 10 pounds frequently with the right, dominant arm and up to 10 pounds with the left arm; (2) sitting, standing, and walking six hours each during an 8-hour workday; (3) occasional postural activities, such as climbing stairs and/or ramps, balancing, stooping, kneeling, crouching and crawling; (4) no climbing ladders, ropes, or scaffolds;

(5) no exposure to hazards, such as dangerous machinery or unprotected heights; (6) handling and fingering limited to frequently bilaterally; (7) overhead reaching limited to occasionally bilaterally; (8) limited to low stress work with no strict production quotas or fast pace and only routine work with few changes in the work setting; and (9) no more than occasional contact with the public, coworkers and supervisors.

*Id*. at 76. Given these limited abilities, Plaintiff could no longer engage in her past relevant work. *Id*. at 83.

Continuing to step 5, ALJ Motta determined that Plaintiff could perform a significant number of jobs (mail clerk, office helper, photocopy machine operator) that exist in the national economy. Her ability to do such jobs meant she was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income. *Id*. at 83-84.

## VI. Discussion

### A. *Earley, Drummond,* and AR 98-4(6)

The Commissioner argues that *Drummond*, 126 F.3d 187 and AR 98-4(6) required ALJ Motta to adopt ALJ Lombardo's previous assessment of Plaintiff's residual functional capacity "except to the extent that any new and material evidence documented a change in Plaintiff's condition." (Doc. #9, *PageID* #1078). ALJ Motto relied on the binding impact ALJ Lombardo's prior assessment of Plaintiff's residual functional capacity imposed under AR 98-4(6) and *Drummond*, "absent new and material evidence documenting a significant change in a claimant's condition…." (Doc. #6, *PageID* #68). And, ALJ Motta found "[t]here is new and material evidence documenting some change in [Plaintiff's] condition since…" ALJ Lombardo's decision. *Id*.

At the time of ALJ Motta's decision, neither she nor the parties had the benefit of *Earley*, 893 F.3d at 933, which declined to extend *Drummond's* application of res judicata to new applications seeking social-security benefits for an unadjudicated time period. The Sixth Circuit in *Earley* explained:

> If an individual, say, files a second [social-security disability] application for the same period of time finally rejected by the first application and offers no explanation for revisiting the first application, res judicata would bar the second application….
>
> 'Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'

*Id.* (quoting, in part, *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)).

So it is here. Plaintiff asserted in her previous applications—the ones ALJ Lombardo resolved—that she had become disabled starting in July 2009. Plaintiff asserted in her more recent applications—the ones ALJ Motta resolved—that she had become disabled starting on January 23, 2013. Plaintiff is not trying to relitigate her previous claim for a previous period of disability; she is litigating her new claim that she became disabled starting on January 23, 2013. In this manner, Plaintiff takes the same approach as the plaintiff in *Earley* by filing "a new application for a new period of time…." *Earley*, 893 F.3d at 933. Res judicata simply does not apply to this situation, *see id.*, and both ALJ Motta and the Commissioner are incorrect as a matter of law in their assertion[3] that ALJ Lombardo's

---

[3] *See* Doc. #6, *PageID* #68; Doc. #9, *PageID* #1078.

assessment of Plaintiff's residual functional capacity "was binding on" ALJ Motta absent new and material evidence. *See id.* [4]

This does not mean, however, that ALJ Motta could not consider ALJ Lombardo's decision. After all, "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Earley*, 893 F.3d at 933. *Earley* calls this a "fresh review," but notes, "A fresh review is not a blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

What, then, did ALJ Motta do? She recited the new-and-material-evidence rule from AR 98-4(6) and *Drummond*, while also effectively taking a fresh look at Plaintiff's new applications and evidence in a manner that aligns with *Earley*. *See Johnson v. Comm'r of Soc. Sec.*, 2018 WL 6440897, at *15 (E.D. Mich. 2018) (and cases cited therein) (when ALJ gives the new evidence a fresh look, *Earley* is satisfied) (and cases cited therein) Report and Recommendation *adopted by* 2018 WL 6434778 (Dec. 7, 2018). This fresh look is seen in ALJ Motta's finding that Plaintiff had severe impairments (obesity, diabetes, and hypertension) beyond those ALJ Lombardo had identified. Further, ALJ Motta described and examined in detail and at length Plaintiff's new medical evidence at Steps 2, 3, and 4 of her sequential evaluation. (Doc. #6, *PageID* #s 71-83). And ALJ Motta found that

---

[4] Again, to be fair, neither ALJ Motta nor the Commissioner had the benefit of *Earley*. Yet, *Earley* applies to ALJ Motta's decision in the same manner that *Earley* applied to a previous ALJ's decision. *See Johnson v. Comm'r of Soc. Sec.*, 2018 WL 6440897, at *15 (E.D. Mich. 2018) (and cases cited therein), Report & Recommendation *adopted by,* 2018 WL 6434778 (Dec. 7, 2018).

Plaintiff's residual functional capacity for light work was more limited than ALJ Lombardo had previously described.  *Compare* Doc. #6, *PageID* #76 *with PageID* #192.  Given these features of ALJ Motta's decision, she did not simply adopt ALJ Lombardo's previous findings.  She effectively conducted a fresh review of Plaintiff's new applications, up-to-date evidence, and disability status during the new time period that started on January 23, 2013.

This is not to say that substantial evidence supports her findings and it draws no conclusion about the other legal criteria ALJ Motta applied.  It is only to say that her decision adequately complied with *Earley*'s direction to take a fresh look at new evidence connected to a new time period.  893 F.3d at 931-34.  A separate inquiry remains about whether substantial-evidence supports the conclusions ALJ Motta drew from her fresh review.

### B.    Remaining Issues

Plaintiff contends that the ALJ erred by applying greater scrutiny to the opinions of her treating physician, Dr. Nenonene, than she applied to the opinions of state-agency record-reviewing physicians.  In this way, the ALJ failed to follow social security regulations and caselaw, according to Plaintiff.

The Commissioner contends, "Plaintiff is attempting to color [the ALJ's] thorough and regulations-mandated analysis [of Dr. Nenonene's opinions] as too-heavy scrutiny when in fact there was nothing improper about it."  (Doc. #9, *PageID* #1085).  The Commissioner further argues, "the ALJ based her assessment of Plaintiff's RFC [residual functional capacity] on the prior ALJ decision RFC—to which she was bound absent new and material

evidence warranting a change in RFC—and on … additional objective medical evidence, which justified some postural limitations but did not support a different RFC finding regarding Plaintiff's sitting, standing, or walking…." *Id*. at 1084-85 (citing *Drummond* and AR 98-4(6)) (other citations omitted).  In a footnote, the Commissioner points out that both Drs. Hinzman and Mikalov were bound by and adopted the prior ALJ's (ALJ Lombardo's) assessment of Plaintiff's residual functional capacity per *Drummond* and AR 98-4(6).  *Id*. at 104 n.4.

The Commissioner inadvertently points to a problem:  Neither Dr. Hinzman nor Dr. Mikalov were bound to ALJ Lombardo's assessment of Plaintiff's residual functional capacity because res judicata does not apply in this case, as explained in *Earley*.  *See supra*, § VI(A).  These physicians essentially shackled themselves to ALJ Lombardo's assessment of Plaintiff's residual functional capacity.  Other than referring to AR 98-4(6) and *Drummond*, they provided no explanation in support of their opinions that indicates they took a fresh look at Plaintiff's new and additional evidence.  Without such a fresh look, the opinions provided by Drs. Hinzman and Mikalov are not grounded on the correct legal criteria, *see Earley*, 893 F.3d at 931-34, despite their expertise in "the evaluation of the medical issues in disability claims under the [Social Security] Act."  Soc. Sec. R. 96-6p, 1996 WL 374180, *2 (July 2, 1996).  Another way to view this problem is that if these physicians had formed their medical opinions based only on the medical evidence, there would be no *Earley* violation.  Instead, because these physicians glued their opinions to ALJ Lombardo's findings without indicating they took a fresh look at Plaintiff's new and additional evidence, they erred as a matter of law.  *See Earley*, 893 F.3d at 931-34.  And

given this error of law, a reasonable mind would not accept their opinions as substantial evidence to support the ALJ's assessment of Plaintiff's residual functional capacity. *See Blakley*, 581 F.3d at 407 (evidence is substantial if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'").

It might seem unfair to the Commissioner to apply *Earley* to Dr. Hinzman's and Dr. Mikalov's opinions because *Earley* identified the ALJ's res-judicata error; *Earley* did not specifically address whether the record-reviewing physicians committed the same error. Yet it would be contradictory, if not absurd, to require an ALJ to take a fresh look at the new and additional medical evidence but permit the same ALJ to credit a record-reviewing physician who failed to conduct such a fresh evidentiary review in violation of *Earley*. Like ALJs, physicians (record-reviewing or otherwise) are not bound by a previous ALJ's decision and are not precluded from asking whether the evidence supports an applicant's most recent application. *Cf. Earley*, 893 F.3d at 932 ("Instead of asking whether the evidence supported Earley's new application, [the] ALJ… thought he was precluded by the first ruling…. That is not how it works."). Consistency, moreover, is achieved by recognizing that both ALJs and physicians are not are bound by a prior ALJ's findings, and both must conduct a fresh review of the applicant's new and additional evidence in connection with a more recent application for benefits.

It might also seem unfair to the Commissioner to apply *Earley* to Dr. Hinzman's and Dr. Mikalov's opinions because they provided their opinions before *Earley* issued. Yet the unfairness falls the other way: Plaintiff has not had her new and additional medical records reviewed by a state-agency physician (or an ALJ) under the *Earley* legal criteria. This is

disconcerting in light of *Earley*'s common-sense observation, "human health is rarely static. Sure as we're born, we die. Sometimes we get sick and sometimes we become better as time passes." *Earley*, 893 F.3d at 933. It is these possibilities that the fresh-review analysis seeks to sort out when a state-agency record-reviewer or an ALJ evaluates subsequent applications for disability benefits supported by new and additional evidence. *See id.*

And looking back further, several dominoes fall under a nudge from *Earley*. Not only did ALJ Motta rely on Dr. Hinzman and Dr. Mikalov, who incorrectly felt bound by ALJ Lombardo's findings, ALJ Lombardo likewise thought she was bound by the previous ALJ—ALJ Redmond's—findings without undertaking a fresh review of Plaintiff's then-new and additional evidence. *See* Doc. #6, *PageID* #182. Because *Earley* rejects this approach, ALJ Motta's error cannot be rescued by the past ALJs' findings.

This is not to say that an ALJ may never rely on a state-agency physician's opinions that pre-dates *Early* and refers to AR 98-4(6) or *Drummond*. And it is not to say that the state-agency physicians err by considering a prior ALJ's findings. It is instead to say—in line with *Earley*—that the prior ALJ's findings are a "legitimate, albeit not binding, consideration" for state-agency, record-reviewing physicians take into account. *See Earley*, 893 F.3d at 933. Here, Drs. Hinzman's and Mikalov's mistake was to credit ALJ Lombardo's findings because AR 98-4(6) and *Drummond* mandated them to do so, not because their fresh look at Plaintiff's new and additional evidence led them to do so. *See id.* Without their fresh look, their opinions do not constitute substantial evidence in support of the ALJ's findings. Consequently, although the ALJ to conducted a fresh review of the evidence, *see supra*, § IV(A), her review relied on evidence that was not substantial—

15

namely, the flawed opinions of Drs. Hinzman and Mikalov.

Even if the ALJ's decision was not flawed by relying on Dr Hinzman's and Dr. Mikalov's opinions, more problems exist. ALJ Motta placed "partial weight" on these record-reviewing physicians' opinions, and she found that Plaintiff's diabetes, hypertension, and obesity are severe impairments that warrant limiting Plaintiff to occasional postural activities. (Doc. #6, *PageID* #81). ALJ Motta also limited Plaintiff to lifting no more than 10 pounds with her left arm but concluded there was "no objective basis to limit significantly the claimant's ability to lift and/or carry with the right, dominant upper extremity." *Id*. at 78. ALJ Motta further wrote, "The prior decision [ALJ Lombardo's] referred only to a left upper extremity impairment…." *Id*.

This misreads ALJ Lombardo's decision. ALJ Lombardo restricted Plaintiff to "no lifting of more than 10 pounds…." *Id*. at 192. She explained, "Restricting the claimant to light exertion with a ten-pound lifting limitation adequately addresses any potential restrictions that might be associated with degenerative abnormalities of the cervical spine." *Id*. at 193. Because ALJ Lombardo limited Plaintiff's lifting ability based on degenerative abnormalities in her neck (cervical spine), ALJ Motta mistakenly observed that ALJ Lombardo's decision "referred only to a left upper extremity impairment." *Id*. ALJ Motta compounded her misreading by finding that Plaintiff could lift and carry up to 20 pounds with her right upper extremity. ALJ Motta reasoned that this restriction "gives maximum benefit of doubt to the claimant's history of mild cervical degenerative disc disease, as well as her subject complaints, and is consistent with the requirements of AR 98-4(6)." *Id*. at 78. In this manner, ALJ Motta simply disagreed with ALJ Lombardo by characterizing

Plaintiff's cervical degenerative disc disease as mild. ALJ Lombardo did not use the adjective "mild" when finding that Plaintiff's "degenerative abnormalities of the cervical spine" warranted restricting her lifting ability to more than 10 pounds. *Id.* at 193.

ALJ Motta also provided no mention, let alone discussion, of the regulatory factors she applied to the opinions of Drs. Hinzman and Mikalov. Such an omission was significant because these physicians did not provide any meaningful supporting explanation for the opinions and did not refer to evidence consistent with their opinions. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c) ("The Commissioner … weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability …."). Again, these physicians merely adopted ALJ Lombardo's assessment of Plaintiff's residual functional capacity under AR 98-4 and *Drummond*. (Doc. #6, *PageID* #s 215, 236-37). Doing so, they did not point to any evidence that they relied on to adopt ALJ Lombardo's decision or residual-functional-capacity assessment. They, moreover, incorrectly thought AR 98-4(6) bound them to ALJ Lombard's previous decision, *see supra*, § IV(A), and their cursory comments fail to show that erred by not taking a fresh look at the medical evidence. *See id.*

This returns the present review to ALJ Motta's decision to place "partial weight" on Plaintiff's treating physician Dr. Nenonene's opinions. The Commissioner mischaracterizes Plaintiff's argument as an attack on the scrutiny ALJ Motta gave Dr. Nenonene's opinions. Plaintiff's argument is comparative: She maintains that ALJ Motta erred by subjecting Dr. Nenonene's opinions to greater scrutiny than she applied to the opinions of Drs. Hinzman and Mikalov. Plaintiff is correct that the ALJ did this, *compare* Doc. #6, *PageID* #81 *with*

*PageID* #s 81-83, and she is correct that this constitutes legal error. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). Similarly, "the regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed, they call for just the opposite." *Id*. at 380.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## VII.   Remand Is Warranted

Remand is warranted when an ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under

sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to errors identified above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying disability pursuant to the applicable five-step sequential evaluation procedure.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability Decision issued on February 1, 2017 be vacated;

2. No finding be made as to whether Plaintiff Terri Parrish was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Social Security Administration under sentence 4 of 42 U.S.C. §405(g) for further consideration consistent with this Report and any Decision and Entry adopting this Report and Recommendations; and

4.     The case be terminated on the docket of this Court.


April 3, 2019                          *s/Sharon L. Ovington*
                                       Sharon L. Ovington
                                       United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).